UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Susan W. Hanger,

Plaintiff,

v.

Civil No. 01-1506 (RHK/RLE)

**MEMORANDUM OPINION AND ORDER**

Lake County, et al.,

Defendant.

---

Steven W. Schneider, Downs, Reyelts, Leighton, Bateman & Hylden, Duluth, Minnesota, for Plaintiff.

Dyan J. Ebert, Quinlivan & Hughes, P.A., Saint Cloud, Minnesota, for Defendants Lake County, Wilma H. Clark, Clair A. Nelson, Sharon Hahn, Stanley Nelson, and Derrick Goutermont.

Pamela Parkinson, Two Harbors, Minnesota, pro se.

---

## Introduction

Following her resignation as the Human Resources and Safety Administrator for Lake County, Minnesota, Plaintiff Susan W. Hanger "tossed everything in the kitchen, including the sink, at her former employer," Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1004 (7th Cir. 1997) (Evans, J.), including the Family and Medical Leave Act (FMLA), Title VII, gender and disability discrimination under Minnesota Human Rights Act, conspiracy to violate equal protection under 42 U.S.C. §

FILED DEC 3 1 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD DEC 3 1 2002
DEPUTY CLERK

1985, negligent infliction of emotional distress, and negligent retention and supervision. Along with Lake County, Hanger sued each Lake County Commissioner in his or her individual capacity and Pamela Parkinson, the contract employee who shared her office (collectively, "Defendants"). At the close of discovery, Hanger dismissed all but her FMLA and § 1985 claims. Defendants have moved for summary judgment on the remaining claims, and for the reasons below, the Court will grant those motions.

## Background

### A. Hanger's Employment with Lake County

One day prior to giving birth on May 26, 1999, Susan Hanger began a leave of absence from her job as the Human Resources and Safety Administrator for Lake County, Minnesota. (Ebert Aff. Ex. A (Hanger Dep.) at 71:25-72:13.) She began her employment with Lake County in April 1996 as Personnel Officer and Clerk to the Lake County Board of Commissioners ("the Board"). (Id. at 19:23.) After a year-and-a-half, the Board changed her title to Human Resources Administrator, and then to Human Resources and Safety Administrator. (Id. at 22:15, 37:2-18.)

The Board, however, was not fully satisfied with Hanger's performance. In her June 22, 1998 performance appraisal, Board members noted that "being flexible is a problem" and that Hanger had a "short fuse." (Ebert Aff. Ex. O (Hanger Annual Performance Review) at 2.) While Board members believed that Hanger had the skills necessary for her position, "she appears to have a hard time organizing or listening to

others. Sometimes consistent energetic performance is lacking." (Id. at 1.) In conclusion, the Board noted:

> Susan needs to work harder on being a team player. Should try to communicate with Board better. Very defensive at times. Needs to follow chain of command with personnel problems and complaints. Work more with Board and Department Heads on safety and personnel. Assure personnel files are complete with federal and state requirements. Notify Board of issues that may come before them. Monthly updates on work accomplishments.

(Id. at 2.) In the year that followed, Board members continued to be troubled by Hanger's performance. (Ebert Aff. Ex. B (C. Nelson Dep.) at 53:23-54:5.) A month before her 1999 annual performance review, Hanger went on maternity leave.

To fill Hanger's position during the eight weeks of her leave, the Board chose Pamela Parkinson, a contract employee. As Commissioner Stanley Nelson testified, "we were already behind the eight-ball, and we wanted someone that could bring [thc human resources department] back up to speed." (Ebert Aff. Ex. F (S. Nelson Dep.) at 13.) By all appearances, the Board was quite taken with Parkinson's performance.

**B. The Board Meets to Expand Parkinson's Role**

On July 13, 1999, thc Board met with Parkinson to consider extending her contract so that she could remain with human resources after Hanger's return. (See Ebert Aff. Ex. H (Minutes of July 13, 1999 Lake County Board Meeting).) The Board's discussion centered on how best to inform Hanger that Parkinson would be working alongside her and whether Parkinson would become Hanger's supervisor.

Commissioner Hahn was concerned that there would be "irreconcilable differences" between the two and suggested that the Board amend Parkinson's contract before Hanger's return so Hanger would be aware from the start that Parkinson was "in fact, the supervisor." (Id. at 183:10.) Commissioner Clark stated that his "desire would have been to make changes before the Family Medical Leave Act [leave] started." (Id. at 183:17-18.) Commissioner Goutermont approved of the changes Parkinson had wrought in the human resources department: "I like the way things are falling into place here—under personnel and I don't want to jump track back onto the same track we were on." (Id. at 186:15-18.)

As the Board discussed the manner in which to implement changes, its members focused on Parkinson's role as the interim director of human resources and her place in the chain on command after Hanger's return:

SHARON HAHN: Well, and—and as far as that goes, the interim director of human resources, we put how long that interim is. When we put Pam in there as an interim we're the ones who decides the end date on it. However, and I guess I need some clarification 'cause I just want to make sure that I'm on the same wavelength as the rest of you guys. When you say she'll be working with Pam, now when I hear work with, I look at equal decision making. Working under Pam is a very clear delineation of the chain of command. And so are we looking at equal here or are we still going to have Pam be the department head with the final say that when there's disagreements between the two that there's no—there's no question of who has the final say in decisions coming out of personnel. That's what I would ask us to be very careful about.

| | |
|---|---|
| CLAIRE NELSON: | Well, I guess everybody's definition is different, but yeah. I mean—It's kind of a defeatist thing to put Pamela. I wouldn't even want to do that, put her in there at the same level as the person. |
| SHARON HAHN: | Well, that's where I was thinking. |

* **

| | |
|---|---|
| RICK GOUTERMONT: | I guess I'm open to the fact the definition of Pam's job is going to change and its probably going to change every—every month as we work through this until things kind of settle out. And interim for HR is probably you don't want to take that title off of it. You want to leave it interim, and if—if we can get all the people in that department understanding what their job is and getting it done, then maybe Pam moves on to a different department, whatever it may be. |
| SHARON HAHN: | It's why I brought up the fact that we have interim there, and we set the terms of the interim. |

***

| | |
|---|---|
| SHARON HAHN: | Because interim— |
| PAMELA PARKINSON: | It does not say interim based on Susan's leave. It just says interim. |

(Id. at 189:25-193:3.)

On July 20, 1999, six days prior to Hanger's return to work, the Board met with Hanger to discuss the new personnel structure in Human Resources. As Hanger recalled, Commissioner Clair Nelson essentially told Hanger, "Well, we wanted to let you know that when you come back that you'll be working for Pamela Parkinson." (Id. at 92:4-6.)

Hanger left the meeting in tears. (Id. at 94:14-15.) Soon thereafter, she drafted a letter of resignation but never submitted it. (Id. at 138:3.)

### C. Hanger Returns to Work

On Monday, July 26, 1999, Hanger returned to work at Lake County. While Hanger's hours, rate of pay, and title remained unchanged (Ebert Aff. Ex. I (Transcript of Veterans Preference Hearing) at 246:5), a desk for Parkinson had been moved into the office Hanger shared with the human resources assistant (Ebert Aff. Ex. A 96:13). Several of Hanger's personal items—including an antique table, coat tree, and reference books—were missing and the office furniture had been rearranged. (Id. at 97:4-13.) Parkinson's password was stored in Hanger's computer when she tried to log in. (Id. at 101:13.)

That night, Hanger stayed at the office late. As she testified, "It was a little after five, and I decided I'd go in and – because, like I said, we'd never had it—Internet access, and I wasn't familiar with the system." (Id. at 104:9-12.) While exploring the system, Hanger made what she considered to be a significant discovery: Parkinson had used the office computer to access pornography. "I was in there and it listed like previously visited sites . . . [a]nd so I clicked on them, I—not knowing if they were HR sites or what. And anyway, I came across lots and lots and lots and lots of sites." (Id. at 105:13-18.) Concerned that she would be blamed for accessing the sites herself, she notified the County's computer person. (Id. at 108:10-15.) She also discussed the incident with the

Board's clerk, Joan Bostic (a friend from human services), and her husband. "I can't work for someone who's unethical," she told Bostic. (Id. at 112:22-23.)

On Thursday, July 29, Hanger met with Commissioner Hahn to discuss the pornography on her computer. While Hahn was troubled by the misuse of Hanger's computer (Ebert Aff. Ex. B (Hahn Dep.) at 39:23-40:5), she was also disturbed by Hanger's eagerness—as an employee trusted with confidential information—to spread news of her discovery (id. at 48:17-20). As Hahn testified, she told Hanger, "There's rumors going about; and whether it's inappropriate use [of the computer] or not, confidential employees have no right to gossip." (Id.) As Hanger understood it, "She said that by me talking to Joan, it could be looked at as a breach of confidentiality." (Id. at 124:11-12.)

On August 9, 1999, Hanger received the following letter, drafted by Parkinson and signed by Hahn:

> Susan,
>
> Pursuant to our recent conversation, this letter serves as a reminder and a reprimand. You are hereby reminded that your classification as a "confidential employee" demands you adhere to the strictest code of discretion and confidentiality. This code means that you will not discuss anything heard within the scope of your employment with anyone except a Lake County Board Member, the Human Resources Department Head, or the Lake County Attorney.
>
> Your actions of the past have been a direct violation of these tenets and will not be tolerated in the future. This letter serves as a formal warning that any further breach will result in the initiation of disciplinary action.

> On behalf of the Lake County Board of Commissioners, I thank you for your past good work as Personnel and Safety Officer.
>
> Sharon Hahn, Commissioner
> Personnel Committee

(Ebert Aff. Ex. J (Hahn Letter).) On August 10, Hanger submitted her resignation, effective at the end of her accrued leave. Two years and one week later, she filed suit.[1]

## Standard of Decision

A party is entitled to summary judgment if the evidence demonstrates that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In viewing the evidence, the Court makes its inferences in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The burden is on the moving party, Enterprise Bank, 92 F.3d at 747; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), and summary judgment should be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). In essence, the court performs a threshold inquiry to determine whether there is need for trial. Id.

[1] Several months later, Hanger returned to work with full back pay and benefits under a settlement with the Board reached in the course of a Veterans Preference Hearing. In March of 2000, Hanger resigned her position at Lake County and moved to Italy.

## Analysis

Defendants have moved for summary judgment on the grounds that (1) Hanger's FMLA claim is barred by the statute of limitations, and (2) Hanger's § 1985 claim is unsupported by the evidence in the record. Because the Court finds that the FMLA claim is untimely and the § 1985 claim is based on a flawed legal premise, the Court will grant Defendants' motion.

### <u>A.</u> <u>FMLA</u>

Congress enacted the FMLA to permit eligible employees of covered employers to take up to twelve weeks of job-protected leave for certain family or medical matters over any twelve-month period. 29 U.S.C. § 26212(a)(1). An employee who takes a family or medical leave under the statute is entitled to be restored "to the position of employment held by the employee when the leave commenced . . . or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A).

Under the FMLA, a claimant must bring a claim within two years of "the last event constituting the alleged violation." 29 U.S.C. § 2617(c)(1). Where the employer has violated the employee's rights willfully, the statute extends the limitations period to three years. 29 U.S.C. § 2617(c)(2). Hanger asserts that her claim is timely because the "last event constituting the alleged violation"—the effective date of her resignation—was less than two years before she filed this lawsuit. In the alternative, she argues that she has

pled and advanced sufficient evidence of willfulness to support the longer limitations period.

Neither contention has merit. A claimant's cause of action under the FMLA accrues when the employer violates the employee's rights under the statute. See Moore v. Payless Shoe Source, Inc., 139 F.3d 1210, 1214 (8th Cir. 1998) (holding that an alleged failure to designate workers' compensation leave as FMLA leave "occurred *and accrued*" at the time the leave should have been properly designated). Here, Hanger asserts Lake County violated her rights under the FMLA by failing to restore her to her prior position (or its equivalent) when she returned from leave. Under this "failure to restore" theory, the last event constituting that alleged violation occurred on July 26, 1999, when she returned to work as Parkinson's subordinate. Because she filed suit more than two years after that date, Hanger's suit falls outside the two-year limitations period.

Even assuming the Court could toll the limitations period under the continuing violations theory—an uncertain proposition at best[2]—Hanger's suit would still be untimely. See Packard v. Continental Airlines, Inc., 2001 WL 1623295 (10th Cir. 2001) (assuming without deciding continuing violations theory applies to FMLA claims). "The continuing violation doctrine is premised on the equitable notion that the statute of

[2] Under the case law of the Eighth Circuit, the Court considers it highly unlikely that the continuing violations theory could be applied to a failure-to-restore claim. See High v. University of Minnesota, 236 F.3d 909, 909 (8th Cir. 2000) ("This court has never applied the continuing violations doctrine to a discrete act, such as failure to promote, and we decline to do so now.").

limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." Martin v. Nannie & Newborns, Inc., 3 F.3d 1410, 1415 n.6 (10th Cir. 1993) (analyzing continuing violations doctrine in context of Title VII), accord Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327-28 (8th Cir. 1995) (noting that equitable tolling of limitation's period under ADEA is appropriate only when "the employee's failure to file in a timely fashion is the consequence of either a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge."). Here, there is no evidence that Hanger was unaware of the alleged FMLA violation or that Lake County thwarted her efforts to file suit. Rather, Hanger's own testimony indicates that she knew she would be working for Parkinson six days before returning to work. Thus, even were FMLA susceptible to a continuing violations theory, Hanger could not avail herself of it.

Hanger also fails to qualify for the three-year limitation period. Under the FMLA, the limitations period extends to three-years for willful violations of the statute. 29 U.S.C. § 2612(c)(2). While the FMLA does not provide an express standard for determining willfulness, the standard put forth by the Supreme Court in the context of the ADEA provides a useful reference point. See Williams v. Schuller Int'l, Inc., 2002 WL 193929 (6th Cir. 2002) (unpublished opinion); Settle v. S.W. Rodgers Co., Inc., 182 F.3d 909 (4th Cir. 1999) (unpublished opinion); Sampson v. Citibank, 53 F. Supp. 2d 13, 19 (D.D.C. 1999). Under that standard, a violation is willful if "the employer either knew or

showed reckless disregard for the matter of whether its conduct was prohibited by [the statute]." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128-29 (1985); see also McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988) (adopting that standard for the Fair Labor Standards Act's two-tiered limitations period.)

Here, Hanger has failed to show that any of the defendants knew or showed reckless disregard as to whether its conduct was prohibited by FMLA. Hanger asserts that later testimony by Board members as to whether they intended Parkinson to be Hanger's supervisor contradicts the minutes of the June 13, 1999 board meeting and thus permits the Court to infer that the Defendants "knew they were violating the FMLA."[3] (Def. Mem. Opp'n Summ. J. at 9.) This argument, however, is not persuasive. Whether the Board intended Parkinson to be Hanger's supervisor is unrelated to whether the Board knew or showed reckless disregard for the legality of that action under the FMLA. While Hanger is entitled to factual inferences, this theory does not require an inferential leap so much as a hop, skip, and jump to another subject entirely. Having failed to produce

[3] While not mentioned by Hanger, the Court has puzzled over Commissioner Clair Nelson's comment that his "desire would have been to make changes before the Family Medical Leave Act [leave] started." (Ebert Aff. Ex. H at 183:17-18.) After making the appropriate factual inferences on Hanger's behalf, however, the Court concludes that Nelson's comment could not lead a reasonable jury to find knowledge or reckless disregard for whether its conduct was forbidden by the statute. Rather, it appears to indicate merely Nelson's awareness that the FMLA is "in the picture," a standard McLaughlin expressly rejects. See McLaughlin, 486 U.S. at 132-33.

evidence that Lake County either knew or showed reckless disregard for the legality of its conduct, Hanger is not entitled to the three-year limitations period under the statute.

**B. Section 1985**

Hanger has also asserted that Defendants conspired to deprive her of her civil rights in violation of 42 U.S.C. § 1985. In order to prove the existence of a civil rights conspiracy under § 1985, Hanger must prove (1) that the defendants did "conspire," (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws," (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of the conspiracy," and (4) that another person was "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3); see also Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996).

The Defendants argue that Hanger has failed to demonstrate the last element; i.e., that she was deprived of a federally protected right because of her gender. Under § 1985, the conspiracy must be "fueled by some class-based, invidiously discriminatory animus." Andrews v. Fowler, 98 F.3d 1069, 1079 (8th Cir. 1996) (internal quotations omitted). Hanger's breathtaking § 1985 argument is that Lake County violated her equal protection rights by treating her differently than other *women*:

> Hanger is a female. The purpose of her leave was because of pregnancy. As a woman, Hanger is in a protected class. Hanger will produce evidence that Lake

> County gave FMLA leave to other pregnant employees and these other pregnant employees were returned to equivalent positions of rights and responsibilities.

(Pl.'s Mem. Opp'n Summ. J. at 14.) This entirely fails to suggest an actionable legal claim. Under § 1985, Hanger must produce evidence that "defendants selected the particular course of action '"because of" not merely "in spite of" its adverse effects upon an identifiable group.'" Id. (quoting Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993)). Here, Hanger merely asserts that she was treated differently than other females. Even if true, this would fail to state a claim under § 1985: Mere differentiation—especially *within* a protected class—does not discrimination make. Accordingly, the Court will grant the Defendants' motion.

**Conclusion:**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1) Defendants Lake County, Wilma H. Clark, Clair A. Nelson, Sharon Hahn, Stanley Nelson, and Derrick Goutermont's Amended Motion for Summary Judgment (Doc. 31) is **GRANTED**;

2) Defendant Pamela Parkinson's Motion for Summary Judgment (Doc. 44) is **GRANTED**;[4] and

---

[4]Parkinson, appearing pro se, filed her papers contemporaneously with the hearing on her co-defendants' motion. While this would ordinarily circumvent the Court's local rules, Parkinson's papers merely adopt the arguments of her co-defendants. Because these arguments apply, if anything, with more force to Parkinson's case, and because the Court concludes that Hanger was not prejudiced by the unorthodox filing, the Court accepts

3) The Complaint (Doc. 1) is hereby **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 31, 2002

RICHARD H. KYLE
United States District Judge

---

Parkinson's papers.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500

## NOTICE

The latest amendments to the federal rules of procedure, (Civil, Criminal, Appellate and Bankruptcy), went into effect on December 1, 2002. The new amendments and related committee notes can be found at www.uscourts.gov/rules/amendments0202.htm.

One change is particularly noteworthy. That is Rule 7.1 of the Federal Rules of Civil Procedure. This rule requires that corporations file a "disclosure statement" whenever they initially appear as a party in a federal court action. The Rule 7.1 Disclosure Statement must identify "any parent corporation and any publicly held corporation that owns 10% or more" of the stock of the corporate party filing the statement. The purpose of the disclosure statement is to help judges and magistrate judges identify potential conflicts of interest. (Similar disclosure statement requirements are prescribed by Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 12.4 of the Federal Rules of Criminal Procedure.)

Beginning December 1, 2002, a Rule 7.1 Disclosure Statement must be filed by every corporation when it first appears in a federal action, even if the corporation merely reports that there is no parent corporation or publicly held corporation that owns 10% or more of its stock. These Disclosure Statements must also be filed retroactively, for every corporation which is a party to an action pending in this District as of December 1, 2002. The retroactive Rule 7.1 statements must be filed immediately.

It also should be noted that there have been extensive stylistic changes, (as well as a few substantive changes), to the Federal Rules of Criminal Procedure. Attorneys who appear in federal criminal cases should review the amended version of the Rules.